Thank you, Your Honor, and good afternoon. Sinharib Thomas is an Iraqi national who arrived in the United States as a very small child. The only thing that separates Mr. Thomas from those of us who were lucky enough to be born in this country is only a short period of time during his infancy. He has no memory of Iraq. He speaks no Arabic. He knows no one in Iraq, no acquaintances, friends, or family members. He's a member of a persecuted ethnic and religious minority group, the Assyrians. In 2016, our Secretary of State at the time, John Kerry, said that what happened to the Yazidis and the Assyrian Christians at the hands of ISIS was a genocide. Despite this, the current administration is seeking to remove Mr. Thomas from the United States and deport him to Iraq, a country that he has absolutely no recollection of, and a country where he faces an almost certain risk of torture, death, and serious persecution. In 2009, Mr. Thomas had a run-in with the law and was a marijuana-related crime that led him to the conviction that caused him to be deportable in this case. At that time, the government of Iraq was not accepting... I'm sorry. Yes, Your Honor. Excuse me. Judge Fletcher has a question, but is not... We cannot hear you, Judge Fletcher. I can't hear you, Your Honor. I'll mute myself. There you go. Now, there we go. I've unmuted. Can you hear me? I can hear you, yes, Your Honor. I didn't unmute. My question is... Let's just cut to the chase. The serious issue in the case is to whether or not there are changed country conditions between 2009 and then 2019 when he sought to reopen. As I read the country reports upon which the IJ relied, it's possible to read them as saying that there was a continuing course of discrimination against Christians, even specifically Assyrian Christians. Although I'm not sure I read it that way, but what I'm most interested in you is what evidence do you have that tells us that the IJ's conclusion, that it was pretty much the same 2009-2019? What evidence do you have that says it's much worse, materially worse, such that a reopen should be allowed? Thank you, Your Honor. Your Honor, we submitted with our motion to reopen hundreds of pages of evidence, including expert reports that show a number of different things. In 2009, no one heard of a group called ISIS. In 2009, there were no Shia militias, which we are even hearing about in the news every day today. But counsel, as you're going through this, what is the relevance of the identity of the person? In other words, if conditions are the same or worse or better, the identity of who's in charge or who's doing the persecuting doesn't appear in our cases to be relevant. I mean, if ISIS treated them better or worse, that's interesting. But just because it's a different label, I don't understand what relevance that has. Your Honor, it's not just that it's a different label or a different group doing the persecuting. It's that the risk is significantly elevated. That's the point, and I have difficulty seeing that. So I hope you'll answer Judge Fletcher's question with more than the identity of the group. Your Honor, thank you. I can point to just one, I think, important fact that would hopefully demonstrate my position, and that is that in the first few years after the U.S. invasion, up until right around 2010, the country of Iraq, the Christian population in that country, was around 1.5 million. And in 2019, when we filed our brief, that number had dropped to under 200,000. And these are numbers that are included in the expert opinions and expert reports that we included with our motion to reopen. So I understand that the court may have a concern that, yes, things were bad in 2009, and they were, and there's no arguing that, but they are significantly worse in 2019. And I think just that, I mean, we've included, Your Honor. But, you know, there are other things that point in an opposite direction. For example, the fragility index was worse in 2009 than in 2019. And so the question for us isn't how we read the record, but whether the agency abused its discretion in reading it differently. So if there are two plausible ways to understand the evidence holistically, don't we have to uphold what the agency did in reading it their way? Your Honor, it's my position that the agency absolutely abused their discretion. We provided... Well, I know that's your position, but the conclusory statements don't help me get there. Your Honor, thank you. We provided, I mean, hundreds and hundreds of pages of well-documented reports, expert opinions, and other materials that corroborate our position. This is Judge Fletcher again. So far, I'm not being helped very much. To say what you say is true, that is to say the Christian population in Iraq has enormously diminished. But that doesn't necessarily tell me that conditions are worse in 2019 compared to 2009. That is to say, it's entirely possible conditions were terrible all along, and there was a steady outflow of Christians as a result of that. So that by itself doesn't tell me very much. And I know you submitted a lot of pages, and I read pretty much all of them. What I want to know is give me the facts in those pages that tell us what your... support your position that it was worse in 2019. Thank you, Your Honor. And, Your Honor, just for your reference as well, I did lay out all of those facts or the important ones in one section of my brief. One in particular, the increasingly influential role of the Shia militias. This is a cat case, in other words, a convention against torture case. And Mr. Thomas, if his case is reopened, would have to show that he would suffer persecution or torture or death at the hands of the government. In 2014, ISIS, as we all know, came about. As a response to that, the Iraqi government formed these people's militias that were primarily formed of individuals of the Shia faith. These individuals are supported and backed financially and otherwise with weapons by Iraq's neighbor, Iran, who is no friend to the United States. It is these very groups and their rise and their influence within the Iraqi government. They've actually been officially incorporated into the Iraqi military, these militias. And it's these differences and these changes that make things way different than they were in 2009. That's just one among many. Is part of the argument that in 2009, the danger to the Christians was not danger from the government? That is part of the argument, Your Honor. I think there was in 2009, there was a general animus toward Christians in the country. And there were many Islamic militant groups that were targeting them, both for kidnapping and other things. But in 2019, when we filed our brief, there's a clear link between these Shia militias who are extremely anti-American, extremely anti-Christian, supported directly by Iran and the government, the Iraqi government. And so that is part of the argument. Is that a requirement, though? Would it have been sufficient for cat relief in 2009 if the government turned a blind eye to persecution by non-governmental groups? Your Honor, willful blindness is one of the possible ways that a respondent can make a cat claim and be successful. I know that we weren't, as you pointed out early in your comments, that our government was not returning people because Iraq wouldn't take them in 2009. But is that why there was no request for cat relief in 2009 when this first came up? Yes, Your Honor. For decades, in fact, prior to the first Gulf War in the 1990s, Iraq simply would not take back any deportees from the United States. And so it's been a commonly known thing among that community that, you know, hey, if you get an order of removal, it's essentially worthless because Iraq will not take you. And so that was why Mr. Thomas didn't, in his initial removal proceeding, contest anything. Was he represented by counsel at that time? You know, Your Honor, I do not believe he was. I think he was representing, he was just a properer. Can I ask you an offline question here? Would your client be amenable to mediation if the government were willing? I mean, yes, I think he would. I just, I don't know if there's a resolution that could be had in this case, but yes, I think he would. And if I could reserve some time for rebuttal as well. Yes, you're welcome to do that. I'll keep going for a little bit and I'll reserve just about sure. The other issue in this case is with regard to to timeliness. The board indicated that this motion to reopen was not filed in a timely manner. It's pretty clear from their own regulations that significant change in country conditions is an exception to the time limit that is listed in the regulations. And so I believe here we've shown a significant change in circumstances in the country conditions in Iraq. And just want to make one more point about the Shia militias. These groups did not exist in 2009. They are now part of the government. They're officially enmeshed within the Iraqi military infrastructure. And these groups are heavily supported financially and militarily by Iran. They're a direct threat to him and any other Christian in the country. So I think that we have shown that the board abused discretion when they denied his motion to reopen. I think as a general matter that people ought to have their day in court if they ask for it. And Mr. Thomas says yet and partially maybe there's an argument that it's his own fault because he didn't raise it in 2009. But he hasn't had the ability to argue to an immigration judge that he would be unsafe if he's returned. What we're asking is that the court reopen his case so that he can at least have the opportunity to present that to an immigration judge. And I will reserve the rest of my time for rebuttal. Thank you. You may do that. And Miss Fisher, we're ready to hear from you. Good afternoon, Your Honor. Kate Fisher for the government. Can you hear me clearly? Yes. Great. So this is a I'll go. I'll cut right to the chase here. This is a somewhat unusual case because the garden variety changing country conditions case, as I'm sure you're aware, there is an underlying underlying proceeding with a record. And a lot of times there's even a not just a record, an administrative record, but there's a PFR and a court holding. And so in those cases, we have a baseline. And that baseline is what we would compare to see if there's been a change of country conditions from the time the underlying proceeding. So interestingly here, we don't have the baseline because as petitioners counsel just explained, he petitioner did not apply for relief. So the final order was entered. And I will take counsel. Excuse me. Do you know whether he was represented by counsel at that time? I do not. Your Honor. It's not clear from the record. And I looked at that. Certainly. I mean, it's understandable why he didn't, because it was clear that there would be no actual removal undertaken. Correct. Well, I don't know that, Your Honor. I don't know from the I'm not sure that's clear from the record either. Also, as a policy matter, it's not. I think that's something we can take judicial notice of in terms of what what was being done at that time. And I'd like you to assume for the sake of this question that he could he could not be removed in 2009 and that that was the reason why he didn't request relief at that time. Does that make any difference to our analysis or to the question of the exercise of discretion? Correct. See, the reason it makes our analysis, the only relevance that that has is he then because there's no baseline for him to fall back on. He is still in the position where he has the burden of showing that there's been a change in conditions. So he still needs to show that country conditions are changed and he can't fall back on the record or a court holding thing that he didn't have a cause of that. He didn't have a claim for relief back then. So, can you hear me? Yes. Yes, Judge Fletcher, I can hear you in trouble with the implications of your statement that there is no baseline. The IJ thought there was a baseline. He compared the country report in 2008 to the country report in 2017. Are you saying that he should not even have looked at the country report in 2008? No, Your Honor, I'm not saying that. I think that the IJ was bending over backward to be fair in this case because Petitioner simply didn't present any evidence of conditions in 2008. And even to this day. Well, of course he did not. So now my question is, now that we're here in this proceeding, are you saying that the Petitioner can't himself present the 2008 country report as evidence of the conditions then? Well, he could have and he should have. Well, no. He should have come forward with evidence of 2008 and he didn't. Well, wait a minute. You're saying that even though the IJ looked at the 2008 country report, we can't? No, I'm saying you can and you should. What I'm saying is that in Petitioner's appeal brief to the board and his brief to this court, he doesn't discuss the 2008 report at all. He doesn't discuss the evidence on both sides. So he doesn't provide any baseline to the court. What we have is the IJ looking at the 2008 report and finding support in it that Christians were persecuted at that time. I'm afraid you and I are still passing in the night. You're saying he didn't present evidence of the 2008 report. But I don't think you're saying that we can't do it as we're trying to figure out whether there's been a change in conditions or are you? I still don't understand what your what your position is as to what we can look at. I'm sorry, Your Honor, if I'm being confusing. You absolutely can look at the 2008 report and take judicial notice of it, as did the agency. And I have another question for you, too, while you're being sidetracked a little bit. And that is to respond to the issue of whether in the analysis of changed conditions and in the analysis of abuse of discretion, whether it makes any difference that the persecutors were not part of the government in 2009, but they are part of the government in 2019. So I guess the way I would answer that is to say that it might make a difference, but we don't have any discussion of the state or level of persecution by the petitioner hasn't addressed that in 2008. So I guess I'm asking whether he addressed it. I'm not asking about his brief. I can read the brief. What I'm asking about is analytically, does that make it worse or is it not relevant to whether it's worse? I don't think it's it's it's I think that the identity of the persecutor, as you articulated, shouldn't matter. The level of persecution, the change in country conditions. We have to look at what the level of danger he would have faced in 2009. And it's not relevant from whom he faced it. Only the basis on which he faced it, which is his Christian, his religion, since that's his claim.  I don't think it is a question of the danger he faced. I think it's a question of the danger he faced in which the government was involved, either because the government itself would have been the persecutor or the torturer or because the government turned a blind eye to it. The fact that there might have been a private threat of death does not give you a cap claim. So if we're looking at 2008 compared to 2019, I think the degree of government involvement does make a difference, whether it's direct involvement or blind eye involvement. You agree with that? I'm not sure. I guess I agree in theory. But I don't think we know what the... In the 2008 report, I'm not sure it describes from whence the persecution is coming. All we know is that ISIS didn't exist at that time. There's a fair amount of description where it's coming from. It seems to be coming from some Kurdish group. Ms. Fisher, this is Nancy Friedenthal. I had a question for you. The petitioner presented considerable evidence, which is now before us in the administrative record. Some documents seem interesting to me. Those documents in Exhibit MM, the BIA decisions reopening for people in the same position as Mr. Thomas is. One comment specifically in a decision identified a significant change in country conditions because of the potential for visibility to those that may be interested in torturing petitioner or the likelihood that he would be specifically targeted for torture. We have expert reports that indicate that the laissez-passer documents increase Thomas's visibility because he has to pass through checkpoints and he will be readily and immediately identified because he has no identity documents. In 2008, when people were not removed to Iraq, we have virtually no indication that their individuals would be as visible as Mr. Thomas will be now being removed under this permit, so to speak, of providing one-way transport without identity documents with the other factors that are weighing against him. I would like you to address that point that we have the changing country conditions relevant to this petitioner because we have individuals returning with no identity documents, we have increased checkpoints, we have all these other factors that have been discussed that are in the record. So I guess the way I need to answer that is that's a change in his personal circumstances, but are you arguing that it's coupled with the change in country conditions? Well, I guess the point that I'm driving is that the country conditions were such that individuals, no matter who they were, simply weren't there without identity documents. I believe the correct, from the experts, people were deported or returned back to Iraq as long as they had valid passports. So we have people returning with identity documents facing, I think, concededly bad situations, but in 2008, that country was not receiving individuals without identity documents. Now we have a country, it's not just Mr. Thomas, he happens to just be in the target zone. We have individuals who are returning with no identity documents, just a permit, and so the BIA phrased it as a change in the potential for visibility to those who might seek to torture individuals such as Christians and U.S. affiliated people, and now we have the felony as well. It struck me that we have these BIA decisions recognizing this as a change in country conditions, and so that's the question that I wanted to put to you, is why is that not a change in country conditions significant to a petitioner and significant to the country as well? So I follow your question, and I will concede that it's troubling. I just don't know that the record establishes that there was, that there is a change in country conditions in this instance, and we're getting, we're stretching our powers of judicial notice. I'm not sure where that comes from. It comes from another BIA decision, and I'm not sure what the date is, so I guess I would have to look at it more carefully. Well, counsel, it's two things. First of all, it's in the record, but it does seem to be a point as to which we can't take judicial notice. I think it sounds like you're conceding that it may be relevant, and so I'm going to ask you the same question I asked your colleague, and that is whether the government is willing to engage in our mediation program in this case, because it's clearly a very troubling case. To the extent that I would have the authority, I would say that we would rather mediate than get a bad result, so yes, I will answer yes. I did want to answer Judge Fletcher's question. If you look at the 2008 report, it doesn't say that, the report's phrased in the passive, and it doesn't identify the persecutors. So when they talk about gunmen, unidentified gunmen shooting Christians, unknown assailants in their home, and targeted violence against Christians, 2,000 families forced to flee, and it simply doesn't identify who the persecutor was at that time, so I did want to correct that. Well, we do know for the 2,000 families forced to flee that it was the KSG that did that. It was a Kurdish group. That we do know. I've got a different question. As I hear this argument, it occurs to me that one way we might want to look at changed conditions is, with respect to the impact upon someone's condition, well, country conditions in 2009, he faced no risk whatsoever, because the country wouldn't even let him in. And we have, in fact, a dramatic change of conditions now. Now the country will let him in, and we have a fair amount of evidence as to what's likely to happen to him. Isn't the relevant comparison in 2009 is, no danger whatsoever, because there was no possibility that he was going to be let into the country in 2009. Makes the comparison pretty stark. It does, but I have a, as you might expect, I have some policy issues, and I think my client would, with judging a final order as being, as Petitioner Counsel said, essentially worthless, I mean, under that construct, then one receives the order, and then can wait until there's a change. At whatever point it becomes serious, or whatever point it becomes realistic, he could challenge it, whereas he could have challenged it at the time. I don't think it's quite such a parade of horribles as that. If it's an order that may not be executed, but is perfectly capable of being executed, that's a different case. This is a case where there's an order which all concede, I mean, we can take judicial notice of this, that order simply could not be executed. There was no possibility at the time it was entered that, in fact, he would be removed to Iraq. I understand, Your Honor. I'm not going to concede this, because I feel like he still should have applied for relief, even knowing that the order at that time couldn't be executed, and if he had a claim for relief, putting aside whether he was represented or not, it should have been advanced. We simply can't have people ignoring the immigration process because of the ineffectiveness or inability of the agency to effect the final order. I understand. I'm sympathetic with the point. Let me go at it in this way. Assume for the moment that if he could get this reopened, and if he could present the evidence of the likelihood of torture, that he could show to the satisfaction of the agency that there's a sufficient likelihood of torture that he's entitled to carry relief. Just assume that that's the case. You don't have to concede it, but let's assume that that's the case. The government's position is that conditions have not materially changed, which would imply, then, that he would have been subjected to torture in 2009. Isn't that right? And that is the odd thing about this case, that we're in the position of arguing that he may have been subjected to torture then, and that, therefore, there's no change in country conditions. And I'm sure your next question is going to be, well, what difference does it make if he was subjected to torture then, and he's subjected to torture now, then shouldn't we protect him? And the answer is, shouldn't he have pursued the relief and stayed within the 90-day deadline? I think we understand your position, unless my colleagues, you're several minutes over your time. Do my colleagues have further questions, or are we ready for a rebuttal? Thank you, Ms. Fisher. I think we're ready for a rebuttal. Thank you, Your Honor. Just briefly, with regard to the issue of the 2008 report, I don't have it in front of me. I didn't think this would come up. But there is a significant amount of case law out there that says that an IJ can take into account and should take into account country reports, particularly Department of State, U.S. government-issued country reports when analyzing these types of cases. And so I think it was proper for the judge, in this case, to have looked at that report. I will point out that throughout my brief and my motion to reopen that was submitted and in my brief to the board, throughout it, I said country conditions have changed. I was not simply just saying, hey, Iraq is bad now. There was some comparison. Although it's not the deep dive level comparison that the government seems to think is necessary, there was some comparison and that argument was made and preserved for the record. I will also point out, as Judge Fruedenthal pointed out as well, that the BIA has reached in other similarly situated cases the opposite conclusion and to the tune of dozens, if not more, of these cases have been reopened over the past couple of years since the Trump administration began their attempts to forcibly remove individuals that are in the same situation as Mr. Thomas. And I'm just still unclear as to why this one in particular is different. Your Honor, what we are asking for today is not that you grant Mr. Thomas cat relief or any other form of relief that's not within, at least I don't believe, your abilities. We're just asking that he have his day in court. We're asking that his case be reopened so that he can go in front of an immigration judge and prove his case and have a chance to argue these issues in front of a fact finder. Thank you very much and unless there are any further questions, I will stand down. I don't believe there are. Thank you. We appreciate the arguments of both counsel and the case just argued is submitted for decision.
judges: Graber, W. Fletcher, Freudenthal